NOTICE: This opinion is subject to motions for reargument under V.R.A.P. 40 as well as formal revision before publication in the Vermont Reports. Readers are requested to notify the Reporter of Decisions by email at: JUD.Reporter@vermont.gov or by mail at: Vermont Supreme Court, 109 State Street, Montpelier, Vermont 05609-0801, of any errors in order that corrections may be made before this opinion goes to press.

2021 VT 71

No. 2020-081

| | |
|---|---|
| Tina Stocker, et al. | Supreme Court |
| | On Appeal from |
| v. | Superior Court, Windsor Unit, Civil Division |
| State of Vermont, et al. | October Term, 2020 |

Robert P. Gerety, Jr., J.

Sharon J. Gentry of Costello, Valente & Gentry, P.C., Brattleboro, for Plaintiffs-Appellants.

Thomas J. Donovan, Jr., Attorney General, and David Groff, Assistant Attorney General, Montpelier, for Defendant-Appellee State.

PRESENT: Reiber, C.J., Robinson, Eaton, Carroll and Cohen,[1] JJ.

¶ 1. **ROBINSON, J.** Plaintiffs challenge the trial court's decision granting judgment as a matter of law to the State. They argue that the court erred in narrowing the scope of the Vermont Department for Children and Families' (DCF) legally actionable duty and in concluding that no reasonable jury could find that DCF's actions were the proximate cause of then-children B.H. and W.H.'s injuries. They also argue that the discretionary function exception to the State's tort liability does not bar their claim and that the trial court improperly considered factors other than the law and evidence in granting the State judgment as a matter of law. We affirm.

¶ 2. Plaintiffs are W.H. and B.H., who were abused as children, and their grandparents. They brought this tort action for damages in 2014, arguing that DCF failed to accept or respond to

---

[1] Justice Cohen was present for oral argument, but did not participate in this decision.

dozens of reports of physical and sexual abuse of the children between 2008 and 2012. Among other things, plaintiffs made claims of negligence based on DCF's failure to perform its statutory obligations and negligent undertaking.

¶ 3. The State moved for summary judgment on all counts, arguing in part that the State did not breach any duty owed to plaintiffs, that the State was entitled to sovereign immunity because its actions were discretionary and grounded in public policy, and that plaintiffs could not prove causation. In June 2019, the trial court denied DCF's motion for summary judgment, and the case proceeded to trial.

¶ 4. The trial court held a two-week jury trial in January 2020. The final day of trial took place on a Friday during a snowstorm that resulted in the closure of all Vermont courts. After the close of the evidence, the trial court granted the State's motion for judgment as a matter of law on the record. Specifically, the court ruled that even if the jury accepted all plaintiffs' evidence as true and made all reasonable inferences in favor of plaintiff, "the jury could not find the presence of proximate causation." It determined that the jury would have to speculate as to "what actions [DCF] would have taken had they acted on reports of maltreatment of the children that were made and not acted upon" as well as "what it is that would have happened had DCF received that report and acted on it." Further, the court said that "the finding of proximate causation would depend upon a determination by the jury as to what [DCF] would have done when acting in its discretion on matters that do implicate policy." The court concluded that "in order to find proximate cause, the jury would inevitably be forced to assess whether or not DCF exercised discretionary acts correctly or not correctly in matters involving assessments about the policy of the State of Vermont regarding child welfare," and thus there was not a showing of proximate cause.

¶ 5. The court subsequently issued an order to fully articulate the basis for its decision. First, it noted that the State was immune from liability for carelessness or negligence in carrying out discretionary functions. Second, it recognized that the Legislature had expressly provided that

neither § 4915a nor § 4915b should be deemed to create a private right of action. See 33 V.S.A. § 4915b(b). The court thus determined:

> Only where DCF's conduct involves non-discretionary activity not involving policy considerations, and only where DCF's alleged negligent conduct was not taken pursuant to its authority and obligations set forth at 33 V.S.A. § 4915a and § 4915b is it permissible under the law for an injured child to seek damages from DCF for injuries suffered at the hands of an abusive parent or caregiver.

Plaintiffs' only viable legal theory, the court concluded, was that DCF owed plaintiffs a duty to "receive, record, and evaluate reports of abuse under 33 V.S.A. § 4915." Specifically, it found that the only actionable duty of care was that upon receipt of a report of abuse or neglect, DCF must promptly determine whether a report constitutes an allegation of abuse or neglect as defined in 33 V.S.A. § 4912(1); otherwise, the requirements of § 4915 are not actionable because they involve discretionary functions protected by sovereign immunity.

¶ 6. The court reiterated that in order to find proximate cause, "the jury would necessarily be compelled to engage in speculation about how DCF would have exercised its discretion in response to the reports and what action, if any, DCF would have taken under the guidelines of 33 V.S.A. [§§] 4915a and 4915b."

¶ 7. As to plaintiffs' negligent-undertaking theory, the court concluded that the evidence could not support a finding that DCF "undertook to a third person that it would take actions different from, and in addition to, actions within its authority to assess, investigate, and take steps to protect children from harm under the applicable Vermont statutes" or that plaintiffs relied on such an undertaking.

¶ 8. On appeal, plaintiffs argue that the trial court erred in concluding that a reasonable jury could not find DCF breached an actionable duty to protect the children and that a reasonable jury could not find DCF's actions were the proximate cause of the children's injuries. In particular, plaintiffs argue that DCF is liable for negligence and negligent undertaking based on their failures to record, respond, and investigate allegations of abuse. They also argue that their claims are not

3

barred by the discretionary function exception, and that the trial court improperly considered factors other than the law and evidence in granting judgment as a matter of law.

¶ 9. The court may enter judgment as a matter of law against a party "at any time before submission of the case to the jury," V.R.C.P. 50(a)(2), if a claim cannot be maintained under controlling law, V.R.C.P. 50(a)(1); see also Gero v. J.W.J. Realty, 171 Vt. 57, 59, 757 A.2d 475, 476 (2000). Judgment as a matter of law may be granted where "there is no legally sufficient evidentiary basis for a reasonable jury to find for [the nonmoving] party." V.R.C.P. 50(a)(1). "In reviewing the trial court's grant of judgment as a matter of law, we review the evidence in the light most favorable to plaintiff—the nonmoving party—and exclude any modifying evidence." Buxton v. Springfield Lodge No. 679, Loyal Order of Moose, Inc., 2014 VT 52, ¶ 17, 196 Vt. 486, 99 A.3d 171. "If plaintiff fails to present evidence on an essential element of the case . . . judgment should be granted for defendant." Id. In other words, for purposes of evaluating plaintiffs' claims on appeal, we assume that the evidence plaintiffs presented is true and disregard contrary evidence presented by the State; the question before us is whether this evidence is sufficient to prove plaintiffs' claims. We review the court's decision granting judgment as a matter of law without deference. Roy v. Woodstock Cmty. Tr., Inc., 2013 VT 100A, ¶ 58, 195 Vt. 427, 94 A.3d 530.

¶ 10. Plaintiffs advance two theories of liability against the State. First, DCF breached a common-law duty to plaintiffs by failing to meet its statutory obligations under 33 V.S.A. §§ 4911-4915. Second, plaintiffs contend that DCF undertook to protect W.H. and B.H. from abuse and was negligent in carrying out its undertaking. We conclude that plaintiffs' claims based on DCF's alleged violation of duties arising from statutes are limited to claims based on DCF's obligation to receive reports of abuse and promptly determine whether they constitute abuse under § 4915(a), and that in the particular circumstances of this case, plaintiffs cannot establish proximate cause between the failures reflected in the record and plaintiffs' injuries. With respect to plaintiffs' alternate theory, we conclude that plaintiffs failed to establish the threshold requirements to

4

succeed on a theory of negligent undertaking. We consider each theory of liability in more detail below.

## I. Common-Law Claim Arising from Statute

¶ 11. Plaintiffs' negligence claim against DCF is based on DCF's alleged breach of a duty of care set forth in statute. Essentially, plaintiffs argue that DCF is liable to them for damages arising from DCF's violating its statutory obligations under 33 V.S.A. §§ 4911-4915, and that the trial court erred in narrowing DCF's statutory duty, which it characterized as to "receive, record, and evaluate reports of abuse" under § 4915. Drawing on our decision in Sabia v. State, plaintiffs highlight the language in § 4915 providing that DCF "shall" promptly respond to reports of abuse or neglect, "shall" begin an assessment or investigation within seventy-two hours, and "shall" report to and seek assistance from law enforcement in cases involving allegations of child sex abuse. See 164 Vt. 293, 669 A.2d 1187 (1995). Plaintiffs contend that there was substantial evidence that DCF ignored reports of alleged abuse altogether and failed to assess or investigate valid reports of abuse.

¶ 12. In analyzing plaintiffs' claims based on DCF's alleged failure to satisfy its statutory duty, we draw on three related but distinct considerations: (A) the extent to which DCF may be liable to plaintiffs for its failure to meet its statutory obligations, (B) the limitation on the State's waiver of sovereign immunity for certain discretionary acts, and (C) the requirement that plaintiffs prove a causal relationship between the State's alleged breach of its statutory duties and their injury. As set forth more fully below, we agree with the trial court that DCF's potential liability for damages under this theory is limited to injury resulting from its violations of § 4915(a) and does not extend to conduct involved in an assessment or investigation, or to discretionary decisions made thereafter. And, accepting plaintiffs' allegations that DCF ignored particular reports of alleged abuse in this case, we conclude that no reasonable jury could find that DCF's conduct was a proximate cause of W.H. and B.H.'s injuries.

5

A. The Scope of DCF's Potential Liability for Breaching Its Statutory Duties

¶ 13.    Plaintiff's statute-based claim rests on a limited exception to the general common-law rule that for purposes of tort liability, a person has no duty to control the conduct of a third person to prevent harm to another. We have long recognized an exception for some duties created by statute, most notably in the case of Sabia and its progeny. See id. Because the common-law duty of care arises from statute, the scope of an injured party's claim for damages arising from a breach of the duty is likewise shaped by the terms of the statute. Applying these principles to the record in this case, we agree with the trial court that plaintiffs' potential common-law claim for damages arising from DCF's failure to meet its statutory obligations is limited to DCF's obligations under 33 V.S.A. § 4915, and does not extend to asserted failures to meet its obligations pursuant to §§ 4915a and 4915b.[2]

¶ 14.    With some exceptions, the general common-law rule is that a person has no duty to control the conduct of a third person to prevent harm to another. See Montague v. Hundred Acre Homestead, LLC, 2019 VT 16, ¶ 15, 209 Vt. 514, 208 A.3d 609; Restatement (Second) of Torts § 315 (1965); see also Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 37 (2012) ("An actor whose conduct has not created a risk of physical or emotional harm to another has no duty of care to the other unless a court determines that one of the affirmative duties [listed in the Restatement (Third)] is applicable.").

---

[2]    Plaintiffs also broadly suggest that DCF has duties under 33 V.S.A. §§ 4911-4914. Section 4911 reflects the purpose of the statutes, § 4912 lays out the definitions applicable to the subchapter, § 4913 establishes the requirements for mandatory reporters, and § 4914 describes the nature and content of a report made to DCF. As to §§ 4911 and 4912, we do not understand plaintiffs to be making an argument that these provisions establish independent duties to support a tort claim, and that is not how plaintiffs have briefed their argument. As to §§ 4913 and 4914, although plaintiffs argued to the trial court that individual defendants breached their duties under these provisions, they have not briefed those arguments on appeal. See Alpine Haven Prop. Owners' Ass'n v. Deptula, 2020 VT 88, ¶ 21 n.3, __Vt.__, 245 A.3d 1245 ("We consider only those arguments that are adequately briefed.").

¶ 15.    One exception to this general rule is that in some cases courts may recognize a private right of action for damages based on violation of a statutory duty.  We have noted that the Restatement (Second) of Torts § 874A provides a framework for determining whether a private right of action for damages is available to remedy the violation of a statute that does not expressly include a civil remedy.  See Montague, 2019 VT 16, ¶ 23.  The Restatement (Third) recognizes that § 874A of the Second Restatement was primarily directed at private actions for damages arising from the violation of statutes proscribing misfeasance, rather than the violation of statutes imposing affirmative duties, and more squarely recognizes this principle in the context of affirmative duties to protect others from third parties.  See Restatement (Third) of Torts: Liability for Physical and Emotional Harm § 38 ("When a statute requires an actor to act for the protection of another, the court may rely on the statute to decide that an affirmative duty exists and to determine the scope of the duty."); id. cmt. a (recognizing that Restatement (Second) § 874A did not squarely address situations in which a statute creates an affirmative obligation to act).[3]

¶ 16.    This Court has recognized just such a private right of action against the State arising from statutes requiring DCF to take steps to protect neglected and abused children in the case of

---

[3]  This is distinct from the principle that where a duty of reasonable care for purposes of tort law exists:

> The court may adopt as the standard of conduct of a reasonable [person] the requirements of a [statute or regulation] whose purpose is found to be exclusively or in part:
>  (a) to protect a class of persons which includes the one whose interest is invaded, and
>  (b) to protect the particular interest which is invaded, and
>  (c) to protect that interest against the kind of harm which has resulted, and
>  (d) to protect that interest against the particular hazard from which the harm results.

Restatement (Second) of Torts § 286 (emphasis added).  For the purpose of their "common law negligence" argument, plaintiffs have not offered an independent basis for DCF's duty apart from the statute itself.  Although § 286 might be pertinent to determining the standard of conduct applicable in the face of a duty that exists independent of the statute, it does not describe the principle of law that allows a court to recognize a duty of care based in a statutory obligation.

Sabia and its progeny. In Sabia, the plaintiffs sued DCF (then called the Department of Social and Rehabilitation Services (SRS)) for allegedly breaching its statutory duty to protect them from further abuse by failing "to take any steps to remove [the plaintiffs] from the home of [the alleged abuser], or to have [the alleged abuser] removed from the home, and/or to formulate any plan to ensure [the plaintiffs'] safety." 164 Vt. at 297, 669 A.2d at 1190-91 (quotation marks omitted). Reviewing our case law, we explained that to determine whether a governmental body has undertaken a duty of care towards specific persons that is above and beyond its duty to the general public—that is, whether a plaintiff may have an implied private right of action—this Court considers:

> (1) whether a statute sets forth mandatory acts for the protection of a particular class of persons; (2) whether the government has knowledge that particular persons within that class are in danger; (3) whether those persons have relied on the government's representations or conduct; and (4) whether the government's failure to use due care would increase the risk of harm beyond what it was at the time the government acted or failed to act.

Id. at 299, 669 A.2d at 1191.[4]

¶ 17. In Sabia, we explained that 33 V.S.A. § 4915(a) at the time provided that DCF " 'shall cause an investigation to commence within seventy-two hours after receipt of a report' of child abuse"; that "the investigation 'shall include' a visit to the child's home and an interview with, or observation of, the child"; and, "if the investigation produces evidence of abuse or neglect, [DCF] 'shall cause assistance to be provided to the child and [their] family in accordance with a written plan of treatment.' " Id. at 299, 699 A.2d at 1191-92 (quoting 33 V.S.A. § 4915 (1981)

---

[4] Notably, the test we adopted to determine whether violation of a statutory obligation is tantamount to breaching an affirmative duty of care to protect another from a third party for purposes of tort-law damages borrows heavily from the factors relied upon at common law to determine whether a party—in this case the government—has entered into an undertaking to render services to another that gives rise to a common-law duty of care for tort law purposes. See Restatement (Second) of Torts § 323 (explaining that a person who undertakes to render services to another which the person should recognize as necessary for the protection of the other's person or things may be liable for failure to exercise reasonable care in performing the undertaking if the failure to exercise reasonable care increases the risk of such harm or the harm results from the reliance of the other or the third person on the undertaking.)

(amended 1996, 2000, 2007, 2008, and 2015)).  Applying the above factors, we held that this mandatory language, along with the expressly stated purpose of the provisions to " 'protect children whose health and welfare may be adversely affected through abuse or neglect,' " " 'strengthen the family and make the home safe for children,' " and provide a safe and nurturing environment for children when necessary, id. at 299, 699 A.2d at 1192 (quoting 33 V.S.A. § 4911 (1981) (amended 2008)), undoubtedly "create[d] a duty on the part of [DCF] to assist a particular class of persons to which [the] plaintiffs belong[ed] and to prevent the type of harm suffered by [the] plaintiffs." Id. at 299, 699 A.2d at 1192.  We accordingly reversed the trial court's dismissal of the plaintiffs' claims.  Id. at 312, 699 A.2d at 1199.

¶ 18.    The terms of the statute at issue were critical to our assessment of the existence and scope of the State's potential tort liability to the Sabia plaintiffs.  Our Sabia decision stands in stark contrast to our ruling in the case of Sorge v. State, 171 Vt. 171, 762 A.2d 816 (2000).  In that case, we affirmed the trial court's dismissal of a suit against DCF for negligent supervision of a child in DCF custody who assaulted a delivery person.  Id. at 180-81, 762 A.2d at 823.  Although the primary issue in that case was whether the State had a duty to the delivery person based on its "special relationship" with the child, we noted that the relevant statutory provisions did not create any duty on the part of DCF to protect the class of persons to which the delivery person belonged from the type of harm the delivery person suffered.  Id. at 175, 762 A.2d at 819.  Thus, the existence and scope of a duty of care arising from a statute, as opposed to some other common-law bases for recognizing a tort-law duty of reasonable care, turns on the specific terms of the statute at issue.

¶ 19.    As plaintiffs note, we concluded in Sabia that 33 V.S.A. § 4915 established a statutory duty of care.  164 Vt. at 300, 669 A.2d at 1192.  In 2007, after our decision in Sabia, the Legislature substantially amended the language of this statutory framework, and notably, added the stated purpose to "[e]stablish a range of responses to child abuse and neglect that take into account different degrees of child abuse or neglect."  2007, No. 168 (Adj. Sess.), § 1.  Consistent with this purpose, the current language grants DCF broader discretion in pursuing an appropriate

course of action. Rather than requiring DCF to investigate each report of abuse, the statute requires that DCF first determine whether a report meets the definition of abuse or neglect. 33 V.S.A. § 4915(a). Under § 4912 an "abused or neglected child" includes one "whose physical health, psychological growth and development, or welfare is harmed or is at substantial risk of harm by the acts or omissions of his or her parent" and one "who is sexually abused or at substantial risk of sexual abuse by any person." Id. § 4912(1). If DCF determines a report is a valid allegation of abuse or neglect, it "shall determine whether to conduct an assessment as provided for in section 4915a . . . or to conduct an investigation as provided for in section 4915b." Id. § 4915(b). Whether conducting an assessment or investigation, either "shall begin . . . within 72 hours after the receipt of a report made pursuant to section 4914" provided that there is sufficient information to proceed. Id. Sections 4915a and 4915b establish the procedures for assessments and investigations, respectively. They each provide steps that an assessment or investigation must include "to the extent that is reasonable under the facts and circumstances presented by the particular valid allegation of child abuse or neglect." Id. § 4915a(a); see also id. § 4915b(a) (using similar language). Section 4915b(b) expressly states: "Nothing contained in this section or section 4915a of this title shall be deemed to create a private right of action."

¶ 20. Applying the above legal principles to the statute as it currently exists, we conclude that any implied right of action against DCF based in this statutory scheme is limited to violations of mandatory duties pursuant to § 4915 and does not extend to failures to exercise due care, or follow the requirements of the statute, in connection with assessments and investigations conducted pursuant to §§ 4915a and 4915b.[5] We reach this conclusion for two reasons. First,

---

[5] We recognize that our focus on the mandatory nature of the statutory duty addresses only the first of the four factors defined in Sabia. We don't address the remaining three factors—whether the government has knowledge that particular persons within the class are in danger, whether those persons relied on the government's representations or conduct, and whether the government created an increased risk of harm—because of our conclusions with respect to sovereign immunity and considerations of causation. See Sabia, 164 Vt. at 299, 669 A.2d at 1191.

insofar as the Legislature has expressly indicated that §§ 4915a and 4915b are not to be construed as giving rise to a private right of action, this Court declines to invoke its common-law authority to recognize an affirmative common-law duty of care to protect another from harm based on a statutory obligation. Second, the framework for executing DCF's statutory obligations under §§ 4915a and 4915b is rife with the kind of discretionary judgments by state actors that are exempt from the State's waiver of sovereign immunity for tort claims. Under the amended statute, DCF is only required to conduct an assessment or investigation if the report is accepted as a valid report of abuse. And a report is only valid if DCF determines that it meets the definition of abuse under § 4912. Thus, the statutes implicate substantial discretion by DCF, narrowing its actionable duties, as discussed below. Accordingly, in evaluating the sufficiency of plaintiffs' claims, we exclude from our consideration claims based on a failure to properly assess or investigate a valid report of abuse pursuant to §§ 4915a or 4915b. [6]

### B. Sovereign Immunity and the Discretionary Function Exception

¶ 21.    The second consideration that substantially narrows the scope of plaintiffs' claims for damages is sovereign immunity. Because claims based on the performance of or failure to perform discretionary duties are not exempt from the State's waiver of sovereign immunity, plaintiffs cannot recover damages for injuries resulting from the negligent performance by state actors of discretionary functions. Applying this principle, we conclude that plaintiffs' only viable claim against the State is that DCF failed to promptly determine whether a number of reports of

---

However, we do address these factors below as they relate to plaintiffs' negligent-undertaking theory. See, infra, sec. II.

[6] Plaintiffs also appear to argue in their brief that §§ 4915a and 4915b establish a standard of conduct. As discussed supra, ¶ 15 n.3, § 286 of the Restatement (Second) of Torts describes when a statute may establish a standard of conduct distinct from the reasonable-care standard. However, this framework only applies where there is an existing legal duty. Because we conclude that DCF's scope of liability is limited to its obligation to make a determination of whether a report of alleged abuse is valid and does not extend to the conduct of an assessment or investigation, we need not consider plaintiffs' argument regarding the standard of conduct for carrying out an assessment or investigation.

alleged child abuse or neglect were valid as required by 33 V.S.A. § 4915(a). Otherwise, DCF's obligations under § 4915 are discretionary and implicate policy decisions. We expand on these considerations below.

¶ 22. The State can only be held liable for damages when it has expressly waived sovereign immunity. Sutton v. Vt. Reg'l Ctr., 2019 VT 71A, ¶ 35, __Vt.__, 238 A.3d 608. Under the Vermont Tort Claims Act (VTCA), the State has waived immunity with respect to suits for injuries to persons "caused by the negligent or wrongful act or omission of an employee of the State while acting within the scope of employment, under the same circumstances, in the same manner, and to the same extent as a private person would be liable to the claimant." 12 V.S.A. § 5601(a). The State has thus waived immunity "only to the extent a plaintiff's cause of action is comparable to a recognized cause of action against a private person." Sabia, 164 Vt. at 298, 669 A.2d at 1191. Tethering this waiver to common law "serves to prevent the government's waiver of sovereign immunity from encompassing purely 'governmental' functions." Denis Bail Bonds, Inc. v. State, 159 Vt. 481, 485-86, 622 A.2d 495, 498 (1993).

¶ 23. There are a number of exceptions to the VTCA, including that the State does not waive immunity for claims "based upon the exercise or performance or failure to exercise or perform a discretionary function or duty . . . whether or not the discretion involved is abused." 12 V.S.A. § 5601(e)(1).

¶ 24. We apply a two-part test to determine whether a plaintiff's claim is barred by the discretionary function exception to tort liability. The first prong requires us to determine whether the challenged act or omission involves "an element of judgment or choice." Earle v. State, 2006 VT 92, ¶ 23, 180 Vt. 284, 910 A.2d 841 (quotation omitted). "If a statute or regulation or policy specifically prescribes a course of action for an employee to follow, then the discretion requirement is not met." Ingerson v. Pallito, 2019 VT 40, ¶ 13, 210 Vt. 341, 214 A.3d 824 (quotation omitted). We have explained that acts furthering policy decisions fall within the discretionary function exception "only if there is a range of discretion to exercise in deciding how to carry out that

12

decision." Sutton, 2019 VT 71A, ¶ 41 (quotation omitted). "While the discretionary function exception shields the State from liability for administrative and policymaking decisions, it will not excuse the State from liability for failure to act when required or for failure to use reasonable care when executing ministerial tasks in furtherance of a discretionary undertaking." Id. (quotation omitted) (alteration omitted).

¶ 25. If the act is "discretionary in nature," the second prong of the test requires the court to determine "whether that judgment involved considerations of public policy which the discretionary function exception was designed to protect." Estate of Gage v. State, 2005 VT 78, ¶ 5, 178 Vt. 212, 882 A.2d 1157 (quotation omitted). "The purpose of the discretionary function exception is to assure that the courts do not invade the province of coordinate branches of government by passing judgment on legislative or administrative policy decisions through tort law." Ingerson, 2019 VT 40, ¶ 11 (quotation omitted). It is presumed that "when a government agent is authorized to exercise discretion," their acts are "grounded in policy when exercising that discretion." Estate of Gage, 2005 VT 78, ¶ 5. If the State's action involves negligence unrelated to policy objectives, then the second prong of the discretionary exception test is not satisfied. Ingerson, 2019 VT 40, ¶ 14; see also Kennery v. State, 2011 VT 121, ¶ 36, 191 Vt. 44, 38 A.3d 35 (holding that troopers' welfare check on the wrong house did not fall under discretionary function exception because the "discretionary activity at issue was to apply the information given the officers to search the right house" and there was "no public policy analysis in [that] activity"). While the State must act with due care with regard to ministerial acts implementing policy decisions, the discretionary function exception shields discretionary acts that further a protected policy decision when there is a " 'range of discretion to exercise in deciding how to carry out the activity.' " Ingerson, 2019 VT 40, ¶ 16 (alteration omitted) (quoting United States v. Gaubert, 499 U.S. 315, 325 (1991)). The exception applies to such acts "whether or not the discretion involved is abused." 12 V.S.A. § 5601(e)(1).

¶ 26. In evaluating the sufficiency of plaintiffs' evidence, we consider the various mandatory duties assigned to DCF under § 4915 and whether performance of those duties amounts to a discretionary act exempt from the State's waiver of sovereign immunity. The first mandatory statutory duty in § 4915 that plaintiffs invoke is DCF's obligation, upon receipt of a report of abuse or neglect, to promptly determine whether the allegation constitutes child abuse or neglect as defined in § 4912. 33 V.S.A. § 4915(a). The statute does not contemplate any discretion as to whether DCF may make this determination and requires that DCF "shall respond to reports of alleged neglect or abuse that occurred in Vermont" or to a child who is a resident of or present in Vermont. Id. We conclude that whether to promptly make the requisite determination does not involve an element of judgment or choice and thus does not fall within the discretionary function exception.

¶ 27. Although taking the step of making an initial determination of whether a report is valid is non-discretionary, the substantive determination of whether a report meets the definition of § 4912 necessarily involves some discretion and policy considerations. Section 4912 includes in the definition of an abused or neglected child one "whose physical health, psychological growth and development, or welfare is harmed or is at substantial risk of harm" and one "who is sexually abused or at substantial risk of sexual abuse." Id. § 4912(1). While there are undoubtedly instances that clearly fall within this definition, DCF generally exercises its discretion in applying § 4912 to a particular allegation or set of allegations. Even when DCF abuses this discretion, the determination itself is discretionary. 12 V.S.A. § 5601(e)(1). And, the discretion involved in making this determination is the type that the discretionary function exception was designed to protect; DCF is the agency responsible for conducting investigations and assessments of alleged child abuse, and it makes such determinations about where and how to direct its services based on its expertise and policy considerations. For this reason, claims that DCF unreasonably failed to accept an allegation of abuse as a valid report fall outside of the State's waiver of sovereign immunity.

14

¶ 28. The determination of whether to assess or investigate a valid allegation of abuse or neglect under § 4915(b) also involves an element of judgment or choice. Making the determination if an allegation is accepted as valid, and proceeding on the chosen path within 72 hours, are not discretionary. But the determination itself involves the discretionary application of a number of factors, including those listed in § 4915(c), and implicates the kind of policy judgments that fit within the discretionary function exception to the State's waiver of sovereign immunity. For that reason, claims that DCF should have undertaken an investigation rather than an assessment upon accepting a particular allegation as a valid report of abuse fall within the discretionary function exception to the State's waiver of sovereign immunity. (As a factual matter, DCF took some action with respect to the reports that were documented and accepted, and plaintiffs do not contend otherwise; DCF's failure to take action with respect to the alleged reports that were neither documented nor accepted is at the heart of plaintiffs' actionable claims.)

¶ 29. Section 4915(d) does require that DCF conduct an investigation when an accepted report indicates substantial child endangerment. However, even in such a case, DCF must first determine whether a report involves "substantial child endangerment"—a matter of discretion and policy, as described above. 33 V.S.A. § 4915(d).

¶ 30. Finally, although we have concluded that DCF's negligence in meeting its obligations under §§ 4915a or 4915b does not amount to a breach of a duty of care for which plaintiffs can recover damages, we note that even if we concluded otherwise, the conduct of an assessment or an investigation falls directly within the discretionary function exception. Sections 4915a and 4915b expressly provide that an assessment or investigation should include particular aspects "to the extent that is reasonable under the facts and circumstances presented by the particular valid allegation." Id. § 4915a(a); see also id. § 4915b(a); Ingerson, 2019 VT 40, ¶ 18 ("We have explained that as it requires substantial judgment in terms of means and manner, the act of investigation is a discretionary one." (quotation omitted) (alteration omitted)). As noted above, because DCF's investigations involved exercising its judgment, we presume that its

15

decisions involved matters of public policy. See Earle, 2006 VT 92, ¶ 23. And, as we said in Earle, these investigations of allegations of abuse involve weighing competing governmental policies and are precisely the kind of discretionary functions the exception was designed to shield. Id.

¶ 31. Thus, the only claim implicating a non-discretionary act for which DCF can be held liable here is that DCF failed to record a number of complaints of abuse and make an initial determination about whether the reports were valid. The State does not dispute that it has waived immunity as to such claims; however, it argues that plaintiffs here cannot establish causation.

## C. Causation

¶ 32. An essential element of plaintiffs' claims is that DCF's breach of duty was a cause in fact and a proximate cause of the alleged injury. See Palmer v. Furlan, 2019 VT 42, ¶ 8, 210 Vt. 375, 215 A.3d 109. The former requires a showing that the harm plaintiffs suffered "would not have occurred 'but-for' the defendant's conduct such that the tortious conduct was a necessary condition for the occurrence of the plaintiff's harm." Id. (quotation omitted). The latter requires a showing that defendant's conduct was "legally sufficient to result in liability in that the injurious consequences flowed from the defendant's conduct and were not interrupted by some intervening cause." Ziniti v. New England Cent. R.R., 2019 VT 9, ¶ 15, 209 Vt. 433, 207 A.3d 463 (quotation omitted).

¶ 33. Plaintiffs allege that DCF failed to record and respond to over thirty reports of alleged abuse or neglect of W.H. and B.H. made by four different people. As discussed above, DCF has a statutory duty to make prompt determinations of whether any report of alleged abuse is valid; however, DCF can only be held liable if there is a causal connection between the failure to make such determinations and W.H. and B.H.'s injuries. See Rivers v. State, 133 Vt. 11, 14, 328 A.2d 398, 400 (1974). Given DCF's extensive involvement with these children during the period in question, and given that the allegedly unrecorded and unresponded-to reports were mostly the same as the reports that DCF did record, analyze, and accept or decline to accept, we

16

conclude that the court did not err in determining that no reasonable jury could find proximate cause here.

¶ 34. Causation is ordinarily left to the jury to decide, but "it may be decided as a matter of law where the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and circumstances one way." Collins v. Thomas, 2007 VT 92, ¶ 8, 182 Vt. 250, 938 A.2d 1208 (quotation omitted). Generally, we recognize that a jury could make permissible, non-speculative inferences to conclude that DCF's failure to act on a report is the proximate cause of a child's injuries. See Sabia, 164 Vt. at 306-07, 669 A.2d at 1196; see also District of Columbia v. Harris, 770 A.2d 82, 93 (D.C. 2001) (holding that jury could reasonably infer detective's failure to conduct an adequate investigation based on a single report was proximate cause of further abuse and injury).

¶ 35. Plaintiffs urge that the circumstances here are "almost identical" to those in Sabia, where we concluded that a jury could find that DCF's failure to do anything in response to reports of alleged abuse was the proximate cause of the continued abuse of the plaintiffs. 164 Vt. at 306-07, 669 A.2d at 1196. However, this case is distinct from Sabia in that the allegations there were that DCF failed to respond to any reports of abuse or take any action. In this case, between May 2008 and May 2012, when the children were taken into DCF custody, DCF had recorded and conducted intakes for at least twenty-seven reports related to abuse of W.H. and B.H., and conducted at least seven investigations and four assessments. Each child participated in multiple interviews, beginning in May 2008, and repeating in February and May (W.H. only) 2009; and May, September, October, and November (B.H. only) 2010. Throughout this period, DCF opened multiple family cases in response to allegations of abuse or neglect of W.H. and B.H. And, significantly, the allegations from the unrecorded reports of abuse were reflected in the recorded reports.

¶ 36. In particular, plaintiff grandparents alleged that they made a number of reports of physical abuse of W.H. and B.H. that DCF did not record or respond to. Specifically, they reported

17

that W.H. and B.H. were being hit with backscratchers, shoes, and other objects by their father and stepmother, that they were being improperly fed, and that they were living in unsanitary conditions. Grandparents testified that they made these reports to the Springfield DCF office, the Central Intake Office, to police, to social workers, and to school personnel. These allegations were, however, reflected in other reports that DCF did record and respond to. There were at least five accepted reports that DCF investigated based on a risk of physical abuse to W.H. or B.H.—two against mother in 2008 and 2009, two against stepmother in 2010, and one unspecified allegation from grandfather that W.H. came home with bruises. During the 2008 investigation, W.H. reported in an interview that his mother hit both him and B.H., and B.H reported that their father hit them with a backscratcher, but the report was ultimately unsubstantiated. And during the 2010 investigation of stepmother, father admitted that stepmother hit B.H., but the report was unsubstantiated. In the 2009 and 2010 investigations, the children were interviewed and did not disclose any physical abuse.

¶ 37.  One woman who lived with father, stepmother, and W.H. and B.H. also testified that she made between eight and ten calls and visits to DCF to report alleged abuse or neglect while she lived there from late 2010 to early 2011 that DCF never recorded or responded to. Specifically, she testified that she reported an incident where W.H. was hit with a hairbrush that left a mark, that father and stepmother were not feeding W.H. and B.H. properly, that she believed stepmother might be taking nude photos of B.H., and that B.H. and W.H. were exposed to pornography in the home. The housemate's partner similarly testified that she made five to ten reports of abuse of W.H. and B.H. that DCF did not record or respond to. Specifically, she reported that the children were being physically abused, that they would have objects thrown at them, and that they would have their dinner taken away, and she reported one incident where stepmother threw a "maglite flashlight" across the room at W.H., and it hit him after it bounced. She made those reports in person and over the phone to the Springfield DCF office, to the school, and to a social worker from the DCF office. Similar allegations of physical abuse were recorded in other

18

reports, and as noted above, were investigated. As to the report of possible sexual abuse, after housemate heard on the news that father and stepmother had been charged, she contacted the police, who contacted DCF. DCF accepted and investigated these allegations in 2012 and found no evidence that B.H. was sexually abused by father or stepmother. Given this record, a jury would have no non-speculative basis for inferring that if DCF had recorded and acted on the alleged reports noted above—reports that overlapped extensively with the reports it did record and act on—plaintiffs would not have suffered the same injuries.

¶ 38.    We acknowledge that, viewing the record in the light most favorable to plaintiffs, DCF failed to fulfill its statutory duty to respond to reports of alleged abuse. However, given the nature of the reports that DCF is alleged to have failed to respond to, and the nature of the reports that DCF did respond to during the same time period, we conclude that a jury would be forced to engage in impermissible speculation about how DCF would have responded to these reports to conclude that they were the proximate cause of W.H. and B.H.'s injuries. Thus, the trial court did not err in granting judgment as a matter of law on plaintiff's common-law negligence claim arising from DCF's statutory duty.

## II.  Negligent Undertaking

¶ 39.    Plaintiffs' alternate theory of liability is that DCF was negligent in the conduct of its undertaking to protect B.H. and W.H., as defined in §§ 323 and 324A of the Restatement (Second) of Torts. They argue that DCF undertook to protect W.H. and B.H. from abuse and that they were negligent in carrying out that undertaking by failing to adhere to statutory requirements and DCF policies. The State contends that DCF's statutory obligations cannot constitute an undertaking and that this theory cannot provide a separate means to sue the State where DCF's duties exist and are circumscribed by statute.[7]

---

[7] Given the test this Court has adopted for determining whether a violation of the State's statutory obligations can support a private action for damages—a test that hinges in part on whether the State's acts increased the risk of harm or the harm results because of another's reliance on the

19

¶ 40. We do not address whether a theory of negligent undertaking could be based on DCF's statutory and regulatory obligations because we conclude that plaintiffs' evidence is insufficient to meet the elements of negligent undertaking. Specifically, plaintiffs have not pointed to evidence that DCF's conduct increased the risk of harm to W.H. and B.H., that the harm was suffered because of any reliance on DCF by W.H. and B.H. or third parties such as their grandparents, or that DCF undertook to perform the duty of a third person owed to W.H. and B.H.

¶ 41. Section 323 of the Restatement (Second) of Torts provides:

> One who undertakes, gratuitously or for consideration, to render services to another which [the actor] should recognize as necessary for the protection of the other's person or things, is subject to liability to the other for physical harm resulting from [the actor's] failure to exercise reasonable care to perform [the] undertaking, if
>
> (a) [the] failure to exercise such care increases the risk of such harm, or
>
> (b) the harm is suffered because of the other's reliance upon the undertaking.

Accord Sabia, 164 Vt. at 302-03, 669 A.2d at 1194. Section 324A embodies the same principle but focuses on an undertaking to another to render services necessary for the protection of a third person or their things. An actor who undertakes to render such services can be subject to liability to the third person for physical harm resulting from the actor's failure to exercise due care if the failure increases the risk of the harm, the actor has undertaken to perform a duty owed by another to the third person, or the harm results from the reliance of the other, or the third party, upon the undertaking. Restatement (Second) of Torts § 324A.

_____

State's undertaking—plaintiffs' alternate theories may in fact be close cousins. The considerations that inform the question of whether the State's mandatory statutory obligations constitute a duty of care for tort-law purposes in our case law are drawn directly from the factors defining a common-law duty of care arising from an undertaking as defined in the Restatement. We need not determine whether Sabia in fact articulates the test applicable to negligent-undertaking claims based on statutes imposing mandatory affirmative obligations on the State to protect others, or what the relationship is between the negligent-undertaking theory and the common-law negligence theory tied to the requirements of the statute. Because plaintiffs pled these as alternative theories, we address them separately.

¶ 42. Plaintiffs fail to show that DCF's alleged negligence increased the risk of harm to W.H. and B.H. in this case. We have explained that to establish increased risk of harm under § 324A(a), plaintiffs must identify "sins of commission rather than omission," or conduct that "directly increases risk of harm." Murphy v. Sentry Ins., 2014 VT 25, ¶ 27, 196 Vt. 92, 95 A.3d 985 (quotations omitted). The standard of comparison for § 324A(a) is not the risk of harm created if defendant exercised reasonable care, but the risk of harm that would be present if defendant had never undertaken to render services. Kuligoski v. Brattleboro Retreat, 2016 VT 54A, ¶ 80, 203 Vt. 328, 156 A.3d 436. Neither mere failure to discover a danger nor "failure to advise" that permits continuation of an existing risk will subject a defendant to liability. Murphy, 2014 VT 25, ¶ 27.

¶ 43. In this case, plaintiffs may be able to show that, had DCF acted with reasonable care, they would not have suffered as much, but they have not presented evidence that DCF's undertaking to protect them put them at greater risk than if DCF had taken no steps at all. Our analysis in Sabia does not persuade us otherwise. In that case, we suggested that DCF's failure to act increased the risk of harm to the plaintiffs by allowing the harm to continue unabated, which may have sent a message to the perpetrator that he could act with impunity. 164 Vt. at 300, 669 A.2d at 1192. We have since made it clear that allowing a risk of harm to continue unabated, without affirmatively making it worse, is insufficient to support an undertaking under this prong. See Kuligoski, 2016 VT 54A, ¶ 80 & n.14 (noting that the Restatement (Third) of Torts § 43 more explicitly recognizes this point). Moreover, Sabia came to us on an appeal from a trial court's award of judgment on the pleadings to the State; our suggestion that DCF's inaction may have emboldened the abuser reflects the indulgence due to a plaintiff in the context of a motion for judgment on the pleadings. Powers v. Office of Child Support, 173 Vt. 390, 395, 795 A.2d 1259, 1263 (2002) ("A motion to dismiss for failure to state a claim upon which relief can be granted should not be granted unless it is beyond doubt that there exist no facts or circumstances that would entitle [the plaintiff] to relief.").

¶ 44. Likewise, plaintiffs have not demonstrated that W.H. and B.H. suffered injury as a result of their or a third person's reliance on DCF. We considered this "reliance" prong in the case of Kennery v. State, 2011 VT 121, ¶¶ 14-16, 191 Vt. 44, 38 A.3d 35. In Kennery, we held that the State could be liable for negligent undertaking under a § 324A theory where a daughter requested that state troopers conduct a welfare check on her mother's home, the troopers went to the wrong address, and the mother was found outside the next day by the postman and subsequently died of hypothermia. Id. ¶ 16. We concluded that a jury could find that the mother suffered injury due to the daughter's reliance on the troopers conducting a competent welfare check. Id. The daughter alleged that this reliance prevented her from personally checking on her mother and she instead shifted her attention to checking local hospitals. "Had [the daughter] not relied on the troopers' report and personally checked her mother's home, she might have found [her mother] much earlier than the postman, thus possibly limiting or preventing [the mother's] hypothermia." Id. Likewise, in Sabia, in the context of describing a common-law claim pursuant to the principles in § 323 as a private analog to the case against DCF, we noted that the plaintiffs alleged that they relied on the assurances of a DCF employee who promised that something would be done, which may have prevented them from seeking help from other sources. 164 Vt. at 303-04, 669 A.2d at 1194.

¶ 45. In contrast, plaintiffs here offer no evidence of their reliance on DCF's alleged undertaking or that they were deterred from making reports or taking any alternative action based on their reliance. Cf. Langlois v. Town of Proctor, 2014 VT 130, ¶¶ 15-16, 198 Vt. 137, 113 A.3d 44 (holding that a town could be liable for negligent undertaking where plaintiff relied on town's promise to have water disconnected when she discontinued heat to a building and town failed to discontinue water, which resulted in pipes bursting and damage to the building). Plaintiffs W.H. and B.H. repeatedly denied abuse when interviewed about allegations that had been reported to DCF, and plaintiff grandparents continued making reports to DCF unabated; they testified that they did not know how DCF was responding to their reports or, at times, whether there were ongoing investigations. In addition, plaintiff grandparents also contacted the school and police

and continued engaging through multiple channels to try to protect W.H. and B.H. from abuse. Plaintiff grandparents offered no evidence that they held off on taking steps to protect W.H. and B.H. in reliance on any assurances from DCF. We do not suggest that in any case, continued reporting to DCF would preclude a finding of reliance, but that the particular facts in this case do not support a conclusion that W.H. and B.H. suffered injury as a result of any reliance on DCF.

¶ 46. Finally, plaintiffs fail to show that DCF undertook to perform a duty owed to W.H. and B.H. by a third party under § 324A(b). In their complaint, plaintiffs alleged that DCF assumed a duty owed by the parents to W.H. and B.H. However, they point to no facts or case law to support a conclusion that DCF, in conducting its statutory and regulatory obligations, assumes any duty that parents owe to their children. For these reasons, we affirm the trial court's award of judgment as a matter of law on plaintiffs' negligent undertaking claims.[8]

Affirmed.

FOR THE COURT:

Associate Justice

¶ 47. **REIBER, C.J., dissenting.** I cannot join the majority's conclusion that this case warrants judgment as a matter of law. The evidence presented at trial and the posture of the case was such that the jury should have decided whether plaintiffs' injuries were proximately caused by the Vermont Department for Children and Families' (DCF) failure to respond to numerous reports of suspected abuse. On this basis, I respectfully dissent.

¶ 48. A court may grant judgment as a matter of law before the case is submitted to the jury for consideration if "there is no legally sufficient evidentiary basis for a reasonable jury to

---

[8] Plaintiffs also argue that in making its decision, the trial court improperly considered the closure of the court due to the weather. The court specifically indicated otherwise on the record when it granted the motion, stating that it had made the decision not to submit the case to the jury before it was informed that the courthouse was closing due to the snowstorm. For that reason, we find no basis in the record to support plaintiffs' argument.

find for [the nonmoving] party." V.R.C.P. 50(a). If the nonmoving party presented evidence that may fairly and reasonably support each element of a claim, then judgment as a matter of law is improper and the jury must consider the issue. Gero v. J.W.J. Realty, 171 Vt. 57, 59, 757 A.2d 475, 476 (2000). We consider the evidence under the same standard as the trial court: we view it in the light most favorable to the nonmoving party, excluding the effect of modifying evidence and drawing every reasonable inference in favor of the nonmoving party. Id.; Fila v. Spruce Mountain Inn, 2005 VT 77, ¶ 13, 178 Vt. 323, 885 A.2d 723. Under this standard, the question is not whether plaintiffs have proved causation. See Fila, 2005 VT 77, ¶ 17. Rather, the question is simply whether plaintiffs presented evidence that was "legally sufficient . . . for a reasonable jury to find" that DCF's failure to act caused injury to plaintiffs. V.R.C.P. 50(a)(1).

¶ 49. The Vermont Constitution considers the right to a jury trial "sacred," and for good reason. Vt. Const. ch. I, art. 12. Trials of claims in the civil courts are structured to achieve a decision of the community because these cases are tried and decided by a jury of peers. Thus, our precedent properly instructs that proximate cause is ordinarily a matter for the jury to determine, "unless the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and circumstances one way." Roberts v. State, 147 Vt. 160, 163, 514 A.2d 694, 696 (1986) (quotation omitted). This Court has recognized that a jury can permissibly infer that DCF's failure to act on reported abuse proximately caused a child's injuries. See Sabia v. State, 164 Vt. 293, 306, 669 A.2d 1187, 1196 (1995). However, the majority concludes that judgment as a matter of law was proper here because the jury would have needed to speculate to find a causal connection between DCF's inaction and plaintiffs' injury, based on DCF's involvement with the family.

¶ 50. In my view, plaintiffs' evidence was sufficient for a reasonable jury to find that their injuries resulted from DCF's conduct such that the trial court should not have taken the decision out of the jury's hands as a matter of law. The jury heard extensive evidence from both sides during a two-week trial. Four witnesses testified that DCF failed to record and respond to

24

over thirty reports alleging abuse or neglect of plaintiffs. Plaintiffs' expert, Dr. Zeller, opined that DCF's failure to record every report of abuse, even if it involved the same conduct as another report, caused the children to suffer prolonged abuse because "it's all evidence" that DCF uses "in determining whether or not the abuse or neglect occurred." He testified that:

> Each report is an opportunity for the department to get more information about the family. Each report adds to the record that you have that's—potentially shows a pattern of behaviors on the part of the parents or a pattern of behaviors on the part of the children reacting to the situations they're in.

> And one of the things that—that DCF is required to do in looking at whether this is abuse or neglect is to look not only at individual incidents, but also at patterns of behavior. And so . . . if you ignore [numerous reports] over the course of what was essentially a year or two . . . then patterns of behavior are probably there that you don't know anything about because you denied yourself the information that you needed . . . .

> [T]he impact on the kids is that they miss an opportunity to get another layer of protection, to have another set of eyes look at the case and say, okay, now we see something going on.

Moreover, during the defense's case, a DCF worker testified regarding DCF's process for receiving reports of suspected abuse or neglect and reviewed the approximately twenty-seven recorded reports made about plaintiffs' family and household. She explained that many of those reports were not accepted as valid allegations of abuse, but DCF nonetheless forwarded them to the case worker assigned to plaintiffs' family.

¶ 51. On this record, a reasonable jury could conclude that by failing to record and respond to approximately thirty additional reports of suspected abuse, DCF lost the opportunity to make decisions about plaintiffs based on all available information. Had the case not been decided at the conclusion of the evidence, the jury could have concluded that DCF's inaction proximately caused plaintiffs' prolonged abuse, as in Sabia. See 164 Vt. at 306, 669 A.2d at 1196. It is true that in Sabia, DCF failed to respond to any reports of alleged abuse, whereas here DCF responded to numerous reports and conducted several investigations and assessments. The majority relies on this distinction and reasons that because the unrecorded reports of abuse overlapped with the

25

reports of abuse to which DCF did respond and because DCF was already providing services to the family, a jury would have to speculate to conclude that plaintiffs would not have suffered the same injuries if DCF had recorded all reports. But this analysis overlooks the expert testimony that the cumulative effect of the reports demonstrated a pattern of behavior that warranted intervention. Viewed in the light most favorable to plaintiffs, the jury could have reasonably inferred without speculation that had DCF recorded and responded to the thirty additional reports, plaintiffs would not have suffered the same injuries.

¶ 52. Ultimately, two weeks of evidence was before the jury, including expert opinions for and against plaintiff's claims. These facts did not so clearly compel a conclusion to allow the court to decide the case on its own as a matter of law. On the evidence presented, this case should have turned on determinations of credibility and assessments of the weight of the evidence—matters squarely within the province of the jury. See Estate of George v. Vt. League of Cities & Towns, 2010 VT 1, ¶ 56, 187 Vt. 229, 993 A.2d 367 (Reiber, C.J., dissenting) ("[E]valuating an expert's credibility and the weight of the evidence is the ageless role of the jury." (quotation and alterations omitted)); Simpson v. Rood, 2003 VT 39, ¶ 15, 175 Vt. 546, 830 A.2d 4 ("Whether presented with a fact witness or opinion witness, the jury's role is to observe the testimony and weigh the evidence presented."). This is particularly so in child-abuse cases, where the core of the case often calls upon the jury to weigh conflicting testimony and consider expert opinions. In such cases, "[w]here the evidence supports multiple reasonable inferences, we leave it for the jury to choose among them." Monahan v. GMAC Mortg. Corp., 2005 VT 110, ¶ 2, 179 Vt. 167, 893 A.2d 298.

¶ 53. By taking the decision out of the hands of the jury as a matter of law at this stage of the proceeding, the trial court overtook the role of the jury. To be clear, a reasonable jury might have concluded either that DCF did not proximately cause plaintiffs' injuries for the reasons set forth by the majority, or that it did so. But "unless the proof is so clear that reasonable minds cannot draw different conclusions or where all reasonable minds would construe the facts and

26

circumstances one way," this issue falls within the jury's purview.  Roberts, 147 Vt. at 163, 514 A.2d at 696 (quotation omitted).  I cannot conclude that this case presents such a situation, and I therefore respectfully dissent.

_____
Chief Justice